

ORIGINAL

Mark D. Stubbs (9353)
Trent M. Sutton (10073)
FILLMORE SPENCER, LLC
Attorneys for Plaintiff
3301 North University Avenue
Provo, Utah 84604
Telephone: 801-426-8200
Facsimile: 801-426-8208

## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
## CENTRAL DIVISION

| | |
|---|---|
| JOHNNY VEGA, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>UNITED STATES OF AMERICA; UNITED STATES BUREAU OF IMMIGRATION AND CUSTOMS ENFORCEMENT; UTAH COUNTY; PROVO CITY; STEVEN BRANCH, ICE officer, individually; TIMOTHY CHARD, ICE officer, individually; JEFFREY PERKINS, ICE officer, individually; DAVID WARD, ICE officer, individually; UTAH COUNTY SHERIFF JAMES TRACY, individually; PROVO CITY POLICE CHIEF CRAIG GESLISON; individually, MARK TROXELL, Provo City Police Officer, individually; DANIEL CORNELL, Provo City Police Officer, individually; GRANT FERRE, officer at Utah County Sheriff's Department, individually; TODD ORTON, officer at Utah County Sheriff's Department, individually, JASON PHILLIPPI, officer at Utah County Sheriff's Department, individually, JOHN DOES I-XC as agents, servants, or employees of ICE, Utah County Sheriff Department, and Provo City Police Department<br><br>Defendants. | **SECOND AMENDED COMPLAINT**<br><br>Judge Bruce S. Jenkins<br><br>Case No: 2:04cv00663 |



Plaintiff Johnny Vega, by and through undersigned counsel, hereby complains against Defendants United States, United States Bureau of Immigration and Customs Enforcement, Utah County, Provo City, and various officers and agents of ICE, Utah County, and Provo City individually for damages and relief as follows.

## PARTIES

1. Plaintiff Johnny Vega is a former resident of Utah County, State of Utah at the time of the incident herein described.

2. Utah County is an entity organized under the laws of the State of Utah and is responsible for Utah County Sheriff's Department, a legal department organized under and within the laws and governance of Utah County (hereinafter referred to collectively as "UCSD").

3. Provo City is a municipality organized under the laws of the State of Utah and is responsible for Provo City Police Department, a department organized under and within the laws and governance of Provo City (hereinafter referred to collectively as "PCPD").

4. United States Bureau of Immigration and Customs Enforcement (hereinafter "ICE") is an organization under the laws of the United States of America.

5. The United States of America.

6. The following defendants are now, and at all times material to this action were, duly appointed, employed, and acting as officers or agents of the United States Bureau of Immigration and Customs Enforcement ("ICE"), and, therefore, acted under the color and authority of the United States of America. In fact, each of the following were present during the incident in question.

    a.   Steve Branch – Directing Officer of the local ICE office.

    b.   Timothy Chard – ICE Agent

    c.   Jeffrey Perkins – ICE Agent

    d.   David Ward – ICE Agent

    e.   John Does I-XC - As Plaintiff does not know the true names of defendant officers Does 1 through 90 inclusive, plaintiff sues them under these fictitious names. Plaintiff will amend this complaint to include their names and capacities when they are known.

7.   The following defendants are now, and at all times material to this action were, duly appointed, employed, and acting as officers or agents of the Utah County Sheriff's Department in the State of Utah, and therefore, acted under the color and authority of law.

    a.   James Tracy – Utah County Sheriff

    b.   Lieutenant Grant Ferre – Supervising officer for the involved UCSD officers

    c.   Todd Orton – Officer at Utah County Sheriff's Department

    d.   James Phillipi – Officer at Utah County Sheriff's Department

    e.   John Does I – XC - As Plaintiff does not know the true names of defendant officers Does 1 through 90 inclusive, Plaintiff sues them as John Does I-XC. Plaintiff will amend this complaint to include their names and capacities when they are known.

8.   The following defendants are now, and at all times material to this action were, duly appointed, employed, and acting as officers or agents of the Provo City Police Department in the State of Utah, and as such acted under the color and authority of law.

    a.   Craig Geslison – Provo Police Chief

3

    b.  Mark Troxel – Officer of Provo City Police Department

    c.  Daniel Cornell – Officer of Provo City Police Department

    d.  John Does I – XC - As Plaintiff does not know the true names of defendant officers Does 1 through 90 inclusive, Plaintiff sues them as John Does I-XC. Plaintiff will amend this complaint to include their names and capacities when they are known.

9.  Since little more than the initial planning meeting has occurred since the filing of this complaint, it is impossible for Plaintiff to know exactly the role that each defendant played in the raid. Therefore, Plaintiff uses the general term "officers" in the following statement of facts to include all defendant officers unless specifically alleged otherwise.

**JURISDICTION/VENUE**

10. This action arises under the provisions of the Fourth Amendment to the Constitution of the United States of America (U.S. Const. Amends. IV), the Civil Rights Act, Title 42 of the United States Code, section 1983 (42 U.S.C.A. § 1983), the Federal Tort Claims Act, Title 28 of the United States Code, section 1346 (28 U.S.C.A. § 2680) and the State Tort Claims Act (U.C.A. 63-30-01 *et seq*).

11. This Court has jurisdiction by virtue of Title 28 of the United States Code under the following sections: Section 1331 (28 U.S.C.A. § 1331 – Civil Claims under Constitution), Section 1343 (28 U.S.C.A. § 1343 – Civil Rights), and Section 1346 (28 U.S.C.A. § 1346 – FTCA).

12. Venue is proper in this court since the acts and omissions herein complained of occurred in said judicial district and all defendants reside or resided therein. 28 U.S.C.A. § 1391.

13. Plaintiff has timely complied with all notice requirements under both State and Federal law including the notice requirements under 28 U.S.C. §§ 2401 and 2675(a) and Utah Code

4

Annotated § 63-30-11. On July 11, 2003, Plaintiff filed notice on or with Provo City and Utah

County. Neither entity responded within the statutory time. Plaintiff also filed a federal tort claim

notice with the Federal Government on July 23, 2003, and ICE denied the claim in February, 2004.

## GENERAL ALLEGATIONS

14. All allegations in this complaint are pursuant to Plaintiff's personal knowledge or his

current information and belief.

15. Plaintiff is informed and believes, and based on that information and belief alleges, that

each of the defendants is legally responsible in some manner for the occurrences alleged in this

complaint, and unlawfully caused the injuries and damages to Plaintiff as alleged in this complaint.

*Champion Safe – Place of Plaintiff's Employment*

16. The acts that are the subject of this complaint occurred on or about February 19, 2003,

in the City of Provo, Utah County, State of Utah.

17. Champion Safe is a manufacturing company in the City of Provo, Utah County, State

of Utah. It manufactures and distributes safes.

18. In early February, 2003, it employed roughly 160 employees in its manufacturing plant,

including Plaintiff.

19. Plaintiff Johnny Vega was hired at Champion Safe in approximately October 1999. Mr.

Vega, born in Puerto Rico, was a painter. He also helped train new employees and supervised up to

36 other employees in the body shop.

*Defendants Unlawfully Detained Plaintiff without Probable Cause or Reasonable Suspicion*
*and/or according to an Illegal "Seize-First-Ask-Later" Policy*

20. On February 19, 2003, at approximately 10:00 a.m., roughly 90 officers from ICE, UCSD, PCPD, and Orem Police Department entered Champion Safe with a warrant to search employment documents at Champion Safe.

21. Provo City Officers Mark Troxel and Daniel Cornell along with other John Doe officers entered to secure the building.

22. Some officers climbed the roof, checked air ducts, and patrolled the halls armed with weapons, masks, and even a police dog.

23. Other officers guarded each exit and surrounded the perimeter of the property including the parking lot. They blocked off all access roads to the plant.

24. Officers Mark Troxel, Daniel Cornell and other John Doe officers patrolled near the bathroom facilities.

25. Plaintiff Johnny Vega and another Hispanic employee had entered the bathroom facility just minutes prior to the government's invasion. They sat in separate stalls.

26. One officer entered the bathroom and approached the stall doors. He yelled that there were "two in here."

27. The officer loudly rattled the door of Mr. Vega's stall, tried to open it, and ordered, "Get out of there, this is a raid." Supposing it to be a joke, Mr. Vega responded, "Stop playing around."

28. The officer rattled the door more strongly and yelled, "Get out of there, now!" Then he yelled towards the bathroom door, "We need someone who speaks Spanish."

29. Realizing that the officer was serious, Mr. Vega asked if he could finish what he was doing and at least "wipe [his] butt." The officer again yelled, "No! Get out now." He rattled the door more impatiently.

30. Mr. Vega asked who they were and what they were doing. The officer did not answer. So nervous was Mr. Vega and hurried by the constant rattling commands that he stood immediately without a chance to even clean himself and opened the door. He had not even buttoned or zipped his pants up when the officer grabbed him by the arms and yanked him out of the stall. The officer finally told Mr. Vega, "This is an INS raid."

31. Mr. Vega protested and said, "I'm legal. I'm from Puerto Rico."

32. During this time, four or five other officers had entered the bathroom. Defendants Mark Troxell and Daniel Cornell were present.

33. One officer, speaking in Spanish, ordered everyone to exit the stalls immediately. Mr. Vega protested the disrespectful treatment of a United States citizen.

34. The other Hispanic employee was yanked out of the stall with his pants down. The employee was crying and told Mr. Vega in Spanish to "shut up or they'll kill us."

35. The officer gripped Mr. Vega by the arms and Mr. Vega informed them again he was from Puerto Rico and a legal U.S. citizen. He asked them if he could at least "wipe [his] butt" or wash his hands. The officers refused.

36. Surprised by such disrespectful and unreasonable treatment, Mr. Vega asserted again that he was a legal citizen with rights. An officer responded, "You're lying. You aren't from Puerto Rico. You're illegal, just like everyone else!"

7

37. Mr. Vega affirmed his citizenship and requested he be allowed to at least wash his hands at the sink but four or five officers grabbed Mr. Vega, pushed him around, and put his hands in handcuffs (vinyl).

38. They shoved him out of the bathroom. Mr. Vega protested that he was a legal U.S. citizen with rights and could not be treated like this. One officer responded, "We don't care."

39. The officers shoved Mr. Vega towards the front office. Mr. Vega protested his treatment as severely "disrespectful." He demanded he be treated with some respect. The officers told him they were being respectful. Mr. Vega retorted, "Pulling me off the toilet and not letting me wipe my butt is no respect!"

40. He repeatedly asserted that he was willing to cooperate.

41. The officers shoved Mr. Vega into the front office and pushed him into a chair. He was told to be quiet. One officer with Mr. Vega told the three other officers to "stay and watch [Mr. Vega]" while he asked a female officer to check Mr. Vega's citizenship records on her computer.

42. After a time, the female officer announced that Mr. Vega was, in fact, from Puerto Rico, as he had claimed, and a legal U.S. citizen. The officers cut the plastic handcuffs off Mr. Vega's chaffed wrists.

*Other Evidence that Seize-First-Ask-Later was the Illegal Policy Applied That Day.*

43. Elsewhere in the building, other employees were being treated with equal roughness. The officers entered the manufacturing shop and several employees started to run.

44. The officers pulled out their weapons and told everyone not to move, even those who sat quietly working.

45. Rolando Barajas, a Hispanic-appearing employee standing at one of the work stations, was a U.S. citizen born in Chicago. An officer approached him at his station, grabbed him by the arms, and pulled him to the bus. The officer did not ask Mr. Barajas his name, where he was from, or how he came to the United States. He simply pulled Mr. Barajas to the line to be taken to INS. Mr. Barajas protested that he was an American citizen. He said that he was born in Chicago. The officers told him he was a liar. The more he protested, the rougher they shoved him. He said he had his driver's license in the car and they told him it was not sufficient identification. He was shoved onto the bus. After he was brought to the local INS office, he was released several hours later when an officer escorted him to his home to review his birth certificate.

46. Another Hispanic worker, a legal alien from South America, Adolfo Gonzalez, was working in the paint shop when his machine shut down. When he came out to see what was going on, he saw his fellow employees lined up in rows with their hands behind their backs. Several officers accosted Mr. Gonzalez. He told them he was legal and they called him a liar. The officers grabbed him and shoved him face first against a bus in the parking lot. He was handcuffed although he truthfully protested that he had his papers in his car. At every protest, an officer shoved his face harder into the side of the bus. After Mr. Gonzalez was loaded onto the bus, a friend of his, accompanied by an officer, went to Gonzalez's car and brought the papers to the bus. Gonzalez was released to wait outside with the rest of the legal workers.

*Plaintiff Unlawfully Seized and/or Arrested without Probable Cause or Reasonable Suspicion and/or according to an Illegal Slash-and-Burn Policy*

47. Mr. Vega's detainment did not end after his citizenship had been established. After Mr. Vega's wrist-ties were cut, he was still kept in the office chair for a period of time.

48. Finally, an INS officer told two officers to take Mr. Vega outside and "to keep him away from everyone else."

49. It was a chilly winter day. Mr. Vega protested and asked if he could at least get a coat since he was only wearing a t-shirt, jeans, and shoes. The officers refused.

50. Mr. Vega witnessed that armed officers stood at the exits and entrances to Champion Safe. He also saw armed officers patrolling the halls.

51. When he exited the building, officers including Todd Orton and Jason Phillipi from Utah County Sheriff's Department surrounded the perimeter of the building. They blocked access in and out of the parking lot. They detained other citizens, Hispanic and Caucasian, in various groups outside in the cold. It was clear to Plaintiff that no one, especially Plaintiff, was being allowed to move freely on the premises or even to enter or exit the area.

52. The officers detained Mr. Vega outside.

53. After approximately thirty-minutes in the cold, one of the police officers left Mr. Vega. The other police officer asked Mr. Vega which car Mr. Vega drove. Mr. Vega answered a Jeep. Then, the officer asked for Mr. Vega's identification. Mr. Vega responded that his ID was in his vehicle. The officer requested Mr. Vega's keys and escorted Mr. Vega to the vehicle. He asked Mr. Vega why his keys said "Chrysler" if he owned a Jeep. Mr. Vega pointed out that the Jeep logo was on the other side. As Mr. Vega got his ID out of the car, the officer took down Mr. Vega's license plate number. Mr. Vega asked why, but the officer did not answer.

54. When Mr. Vega was returned to his place of detainment, there were four or five Caucasian men detained several feet away from Mr. Vega at a table. But, Mr. Vega was not allowed to join them.

55. Mr. Vega asked if he could go inside to get his jacket. An officer told him INS "hadn't cleared the building yet" and that he needed to wait longer. Roughly fifteen minutes later, Plaintiff asked again if he could get his jacket if another officer went with him. Two female Hispanic employees also asked if Mr. Vega could retrieve their belongings and coats. An officer agreed to escort him.

56. When Mr. Vega entered the building escorted by an officer, several officers commented that "[Mr. Vega] must be the ring leader."

57. It took roughly two to three hours to "clear" the building throughout which time Mr. Vega was detained in the outside cold and told he was not allowed to leave even though the officers had confirmed his citizenship.

*Other Evidence that Slash-And-Burn was the Illegal Policy Applied that Day.*

58. Applying an illegal Slash-and-Burn Policy, Defendants knowingly, intentionally, and recklessly shutdown the entire operation of the plant and seized each citizen, legal immigrant, and illegal immigrant therein including Plaintiff without individualized suspicion or probable cause.

59. At the beginning of the illegal raid, an officer entered each of Champion Safe's offices and announced that everyone was to remove himself or herself into a small corner office at the front of the plant. If an employee looked Hispanic, they were seized and taken elsewhere.

60. The officers explained to workers that this was an INS raid on the property pursuant to a search warrant and ordered each Caucasian employee to move quickly to an office at the front of the building.

61. To ensure compliance, armed officers followed the retreating employees to the place of confinement.

11

62. Approximately ten to fifteen frightened Caucasian employees were herded into the small corner office with two small windows. An armed officer stood at the only door.

63. The phones were ringing with customers. The officers instructed the Caucasian employees that they were not allowed to answer the phones nor were they to make any phone calls. They could not even call their attorneys.

64. The officers instructed the Caucasian employees that they were not allowed to leave their tiny room not even for a bathroom break.

65. In fact, Defendants Timothy Chard and Jeffrey Perkins seized Ray Crosby, the owner of the company. He was not allowed to answer his phone, make any phone calls, or even go to the bathroom. Jeffrey Perkins stood guard at the door for two hours until the raid was over and prevented Ray Crosby from leaving his office, answering his phones, or calling anyone.

66. Some of the employees found a digital and a film camera in their tiny quarters and began to take pictures of what was happening outside in the parking lot: women crying, employees tied up. One officer saw the employees taking pictures and he took the cameras away. He opened the camera with film and confiscated the film. He also watched as the employees erased the pictures off the digital camera.

67. After approximately an hour, the officers began to take the Caucasian employees one-by-one or in small groups out the door to a police car parked in the parking lot for a "background" check.

68. After roughly an hour of waiting in the front room, the Caucasian employees were lead out one-by-one to the parking lot except for Ray Crosby.

69. Without probable cause or reasonable suspicion of an illegal doing, an officer asked each employee for identification and checked each of their backgrounds.

70. After the background check, defendant officers told each employee to wait on the premises and not to reenter the building. If they tried to move from their guarded area, officers grabbed them by the arms and returned them to their spot.

71. In fact, one Caucasian employee tried to reenter the building to use the restroom. He was detained by the officers at the front doors. When he explained that he needed to use the restroom, they told him he could do it outside.

72. Defendants Steve Branch, Jeffrey Perkins, Timothy Chard, David Ward, Mark Troxell, Daniel Cornell, Grant Ferre, Jason Phillippi, Todd Orton, and other John Doe officers were personally involved in seizing Plaintiff inside and outside the building whether physically binding him or patrolling the perimeter to keep him from leaving.

73. In total, the raid took approximately two to three hours.

## FIRST CLAIM
### Section 1983 claim against all State officers individually including Mark Troxel, Daniel Cornell, Grante Ferre, Todd Orton, Jason Phillippi, and John Does I-XC

74. Plaintiff hereby incorporates all prior paragraphs into this claim as if fully set forth herein.

75. On February 19, 2003, plaintiff was a citizen of the United States and was lawfully working at Champion Safe.

76. Each state officer defendant to whom this claim applies had a duty and obligation to protect the civil rights of Plaintiff including his right to remain free from unreasonable searches and seizures.

77. As part of their employment and under color of law, each defendant officer including all John Does, acting under claim of federal and state authority, knowingly, unlawfully and without Plaintiff's consent, forcibly detained and arrested Plaintiff without a warrant, without probable cause, and in an unreasonable manner, thereby violating Plaintiff's rights under the Fourth Amendment of the Constitution of the United States. (U.S. Const. Amend. IV).

78. Defendants violated Plaintiff's rights when they physically seized and searched Plaintiff in the bathroom, when they detained and searched Plaintiff in the front office, when they detained and searched Plaintiff outside the building whether guarding him directly or patrolling the perimeter and each other time as demonstrated at trial.

79. As a result of said actions, Plaintiff's rights were violated and he suffered significant damages.

80. Since all Defendants actions were done by them, and each of them, under the color and pretense of the statues, ordinances, regulations, customs, and usages of the United States and under their authority as officers and agents for the government, this action arises under the provisions of the Fourth Amendment to the Constitution of the United States (U.S. Const. Amend. IV), and under the Civil Rights Act, Title 42 of the United States Code, Section 1983 (42 U.S.C.A. § 1983).

**SECOND CLAIM**
**Section 1983 claim against Provo City and Utah County**

81. Plaintiff hereby incorporates all prior paragraphs into this claim as if fully set forth herein.

82. Provo City and Utah County had a duty and obligation to protect the civil rights of Plaintiff including his right to remain free from unreasonable searches and seizures.

83. PCPD and UCSD voluntarily participated in the unlawful raid.

84. Upon information and belief, defendants PCPD and UCSD violated section 1983 by grossly failing to establish policies or customs to adequately safeguard Plaintiff's Constitutional rights in this case.

85. Upon information and belief, defendants PCPD and UCSD violated section 1983 by providing inadequate policies to sufficiently safeguard Plaintiff's Constitutional rights in this case.

86. Upon information and belief, defendants PCPD and UCSD violated section 1983 by failing to train and supervise their officers to adequately safeguard Plaintiff's Constitutional rights in this case.

87. Upon information and belief, defendants PCPD and UCSD violated section 1983 by failing to follow polices designed to adequately safeguard Plaintiff's Constitutional rights in this case.

88. As a result of such failures, PCPD and UCSD's volunteer participation in the unlawful and unconstitutional area control operations directly resulted in severe damages to Plaintiff.

89. Said defendants' omissions constitute gross negligence, callous indifference, and reckless disregard for Plaintiff's Constitutional rights.

90. Upon information and belief, defendants PCPD and UCSD violated section 1983 by following or adopting or participating in polices of law enforcement which they knew or should have known violated Constitutional law and which directly resulted in the abridgment of Plaintiff's civil rights.

91. Since all Defendants actions were done by them, and each of them, under the color and pretense of the statues, ordinances, regulations, customs, and usages of the United States and the

15

State of Utah, this action arises under the provisions of the Fourth Amendment to the Constitution of the United States (U.S. Const. Amend. IV), and under the Civil Rights Act, Title 42 of the United States Code, Section 1983 (42 U.S.C.A. § 1983).

**THIRD CLAIM**
**Section 1983 claim against the State supervisors, individually: Craig Geslison, James Tracy, Grant Ferre and John Does**

92. Plaintiff hereby incorporates all prior paragraphs into this claim as if fully set forth herein.

93. Craig Geslison, James Tracy, and Grant Ferre had a duty and obligation to protect the civil rights of Plaintiff including his right to remain free from unreasonable searches and seizures.

94. Upon information and belief, said Defendants had or should have had supervisory responsibilities over their officers involved in the raid.

95. Upon information and belief, said Defendants voluntarily participated and or caused their organizations to participate in the raid.

96. Upon information and belief, Defendants violated section 1983 by grossly failing to establish policies or customs to adequately safeguard Plaintiff's Constitutional rights in this case.

97. Upon information and belief, Defendants violated section 1983 by providing inadequate policies to adequately safeguard Plaintiff's Constitutional rights in this case.

98. Upon information and belief, Defendants violated section 1983 by failing to train their officers to adequately safeguard Plaintiff's Constitutional rights in this case.

99. Upon information and belief, Defendants violated section 1983 by allowing or ordering their officers to participate in the raid which directly resulted in the violation of Plaintiff's constitutional rights.

100.    Upon information and belief, defendants violated section 1983 by failing to follow polices designed to adequately safeguard Plaintiff's Constitutional rights in this case.

101.    Upon information and belief, Defendants Geslison and Tracy were not personally present at the raid. But, their failure to supervise their officers directly resulted in the violations of Plaintiff's rights.

102.    Upon information and belief, Defendant Ferre was present at the raid and his gross failure to supervise his officers directly resulted in the violations of Plaintiff's rights.

103.    The failures of Defendants Geslison, Tracy, and Ferre demonstrate gross negligence, callous indifference, and reckless disregard for Plaintiff's Constitutional rights.

104.    As a direct result of said Defendants' omissions, Plaintiff endured significant damages.

105.    Upon information and belief, defendants PCPD and UCSD violated section 1983 by following or adopting or participating in polices of law enforcement which clearly violated Constitutional law and which directly resulted in the abridgment of Plaintiff's civil rights.

106.    Since Defendants actions were done by them, and each of them, under the color and pretense of the statues, ordinances, regulations, customs, and usages of the United States and under their authority as officers and agents for the government, this action arises under the provisions of the Fourth Amendment to the Constitution of the United States (U.S. Const. Amend. IV), and under the Civil Rights Act, Title 42 of the United States Code, Section 1983 (42 U.S.C.A. § 1983).

## FOURTH CLAIM
**Bivens claim against United States supervising officers Steve Branch, Timothy Chard, and John Does individually**

17

107.   Plaintiff hereby incorporates all prior paragraphs into this claim as if fully set forth herein.

108.   Steve Branch, Timothy Chard, and John Does had a duty and obligation not to infringe on the civil rights of Plaintiff including Plaintiff's right to remain free from unreasonable searches and seizures.

109.   Upon information and belief, Steve Branch, Timothy Chard and John Does ordered, organized, and/or acquiesced in the seizure of each individual including Plaintiff on the entire Champion Safe premises without regard to individualized suspicion.

110.   Said Defendants directly involved themselves in the affairs at the plant that day and did nothing to stop the reckless seizures.

111.   Upon information and belief, said Defendants violated section 1983 by grossly failing to establish policies or customs to adequately safeguard Plaintiff's Constitutional rights in this case.

112.   Upon information and belief, said Defendants violated section 1983 by providing inadequate policies to sufficiently safeguard Plaintiff's Constitutional rights in this case.

113.   Upon information and belief, said Defendants violated section 1983 by failing to train participating officers to adequately safeguard Plaintiff's Constitutional rights in this case.

114.   Upon information and belief, said Defendants were personally present at the raid and their failure to properly supervise their participating officers directly resulted in the violation of Plaintiff's civil rights.

115.   Upon information and belief, said Defendants violated section 1983 by failing to follow polices designed to adequately safeguard Plaintiff's Constitutional rights in this case.

116.    By so doing, said Defendants demonstrated gross negligence, callous indifference, and reckless disregard for Plaintiff's Constitutional rights.

117.    As a direct result of said Defendants' affirmative acts and/or omissions, Plaintiff endured significant damages.

118.    Since all Defendants actions were done by them, and each of them, under the color and pretense of the statues, ordinances, regulations, customs, and usages of the United States and under their authority as officers and agents for the government, this action arises under the provisions of the Fourth Amendment to the Constitution of the United States (U.S. Const. Amend. IV) and under Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971).

## FIFTH CLAIM
### Bivens claim against Steve Branch, Timothy Chard, David Ward, and John Does individually

119.    Plaintiff hereby incorporates all prior paragraphs into this claim as if fully set forth herein.

120.    On February 19, 2003, Plaintiff was a citizen of the United States and was lawfully working at Champion Safe.

121.    As part of their employment and under color of law, each defendant officer including all John Does, acting under claim of federal and state authority, knowingly, unlawfully and without plaintiff's consent, forcibly detained and arrested plaintiff without a warrant, without probable cause, and in an unreasonable manner, thereby violating plaintiff's rights under the Fourth Amendment of the Constitution of the United States. (U.S. Const. Amend. IV).

122.    Said violations occurred when Defendants physically seized and searched Plaintiff in the bathroom, when Defendants seized and searched Plaintiff in the front office, when

19

Defendants seized and searched Plaintiff outside the building whether directly watching Plaintiff or patrolling the perimeter and each other time as demonstrated at trial.

123.     As a result of said actions, Plaintiff's rights were violated and he suffered severe damages.

124.     Since all Defendants actions were done by them, and each of them, under the color and pretense of the statues, ordinances, regulations, customs, and usages of the United States and under their authority as officers and agents for the government, this action arises under the provisions of the Fourth Amendment to the Constitution of the United States (U.S. Const. Amend. IV), and under <u>Bivens v. Six Unknown Fed. Narcotics Agents</u>, 403 U.S. 388 (1971).

**SIXTH CLAIM**
**FTCA claim against the United States**

125.     Plaintiff hereby incorporates all prior paragraphs into this claim as if fully set forth herein.

126.     Since the following occurrences were a result of officers acting under the authority of the United States and within the scope of their employment as officers, the following claim arises against defendant United States under the provisions of the Federal Tort Claims Act in Title 28 United States Code section 1346(b) and section 2680(h) (28 U.S.C.A. §§ 1346(b), 2680(h)).

127.     On February 19, 2003, Plaintiff was in the bathroom at Champion Safe sitting in a stall.

128.     The United States, by its employees and under its authority ("officers"), ordered Plaintiff in a threatening and unreasonable manner to exit the stall regardless of whether he had finished. Without cleaning himself or even buttoning his pants, Plaintiff opened the door and

20

Defendant officers yanked him from the stall by his arms without identifying themselves or asking him any questions to justify suspicion.

129.    Officers told Plaintiff this was an INS raid. Plaintiff responded that he was a citizen of the United States and the officers surrounded Plaintiff and continued to restrain him by actual physical force. Plaintiff asserted that he should at least be able to wash his hands, but the officers refused. In fact, the officers called him a liar, shoved him around, handcuffed him, and paraded him through the manufacturing plant to the front office where he was roughly detained for a period of time before the officers checked his citizenship.

130.    The officers' intentionally threatening manner and rigid orders put Plaintiff in fear and apprehension of a battery being inflicted against him.

131.    In fact, the officers intentionally and physically handled plaintiff from the time they yanked him out of the bathroom stall by his arms to his detainment in the front office. Although Plaintiff complained that he was being treated without respect or dignity, the officers continued their intolerable abuse.

132.    Even after his citizenship was determined, the officers refused to let Plaintiff go. Instead, they forcibly detained him outside the building to wait in the February cold without a coat for an extended amount of time.

133.    Plaintiff is informed and believes and therefore alleges that at the time of the above-described events, and at all other pertinent times, Defendant officers had no warrant for the arrest of Plaintiff or other facts or information that constituted probable cause that Plaintiff had ever committed or was about to commit a crime, so as to provide grounds for a lawful arrest; nor did Defendant officers have any facts or information that constituted a reasonable suspicion that

21

Plaintiff was involved in any unlawful activity so as to provide grounds for any detention or restraint whatever on Plaintiff's freedom of movement. Plaintiff's detention, imprisonment, and arrest were, therefore, unlawful, physically harmful, and offensive.

134.     At all times stated, Plaintiff found the contacts made with Plaintiff's body by Defendant officers to be harmful and offensive to Plaintiff's person and dignity.

135.     At no time did Plaintiff consent to any of the acts of the officers alleged above.

136.     Plaintiff is informed and believes that the officers exercised both implied and actual force against his person which resulted in the deprivation of Plaintiff's liberty and compelled him to remain where he did not wish to be whether handcuffed in the bathroom or standing outside without a coat in February.

137.     Plaintiff alleges damages in the amount of at least $250,000, the same amount alleged in his notice to the United States, to compensate his physical and psychological injury, pain and suffering, and other economic damages that occurred as a result of defendants' conduct.

### SEVENTH CLAIM
### Declaratory Judgment/Permanent Injunction
### Immigration and Customs Enforcement Agency

138.     Plaintiff hereby incorporates all prior paragraphs into this claim as if fully set forth herein.

139.     As a result of Defendants' raid at Champion Safe, Plaintiff was seized, arrested, detained, and searched without reasonable suspicion or probable cause and in violation of his Fourth Amendment rights.

140.     Defendant demonstrated a pattern and or policy of illegal and unconstitutional conduct which threatens injury to Plaintiff and others similarly situated in the future.

22

141.    Absent judicial intervention, there is a strong likelihood that Defendants' past outrageous infringements on Fourth Amendment rights in the name of immigrations enforcement will continue and substantially and irreparably damage Plaintiff and others similarly situated regardless of the color of their skin or citizenship in this nation.

142.    Upon information and belief, ICE area control operations investigating local businesses occur regularly in Utah. In fact, a local ICE officer stated that several operations and investigations are underway in Utah County.

143.    ICE is under attack for its area operations against Hispanics across the country, attacks demonstrating similarly unrestrained violations of Fourth Amendment rights of citizens and legal residents of the United States. Such is the subject of controversy even before Congress.

144.    Absent some declaration or injunction from this Court, the unrestrained trampling of Fourth Amendment rights has no reason but to continue even against the same defendants.

145.    This is because both Hispanic and non-Hispanic citizens including Plaintiff were seized without probable cause or even reasonable suspicion that they were engaged in illegal activity. They merely happened to work at a place that had several illegal workers.

146.    Plaintiff has no adequate remedy at law or otherwise for the harm or damage threatened by Defendants as evidenced by the allegations above, and further, because money damages are incapable of remedying the threat of future violations against Plaintiff and others similarly situated.

147.    In fact, the Supreme Court has repeatedly upheld the appropriateness of federal injunctive relief to combat a "pattern" of illicit law enforcement behavior. Allee v. Medrano, 416

U.S. 801, 812 (1974); INS v. Delgado, 466 U.S. 210 n.4 (1984); Hague v. CIO, 307 U.S. 496

(1939); Rizzo v. Goode, 423 U.S. 362, 375 (1976).

148.    Plaintiff will suffer irreparable harm, damage, and injury unless the acts and

conduct of defendant above complained are declared unconstitutional and enjoined. Otherwise,

there is no obstacle to prevent a similar slash-and-burn and seize-first-ask-later tactic from being

used against plaintiff or others similarly situated whether at Champion Safe or any other worksite.

### DAMAGES INFORMATION

149.    The failures, omissions, and affirmative acts of Defendants in Counts One through

Five separately and individually caused injury to Plaintiff Johnny Vega.

150.    Plaintiff was the subject of publicity in newspapers as the "man pulled off the

toilet" and endured the humiliation of having individuals recognize him on the street as that

person.

151.    Plaintiff, a law-abiding citizen, endured the embarrassment of being yanked out of

a bathroom stall without time to even zip up his pants, paraded through the worksite in handcuffs,

separated from the rest of the employees, and treated like a common criminal.

152.    Moreover, Defendants used unreasonable force in making the arrest by handcuffing

plaintiff and treating him roughly in spite of his citizenship and requests for dignified treatment.

Defendants even called plaintiff a "liar" and, although they had pulled him out of the stall and

refused to even "let [him] wipe his butt," told Plaintiff they were treating him with respect.

153.    As a result of Defendants' unlawful conduct, Plaintiff suffered great humiliation,

embarrassment, and mental suffering, all to Plaintiff's damage in the sum of at least $250,000 or

an amount as proven at trial.

154.    The acts, conduct, and behavior of Defendants were performed knowingly, intentionally, and maliciously, and with wanton disregard of Plaintiff's rights for which Plaintiff seeks punitive damages in the sum of $500,000 or in such an amount as will sufficiently punish Defendants for their reckless and callous indifference to a federally protected right and as will serve as an example to prevent a repetition of such conduct in the future.

155.    Plaintiff demands a jury trial pursuant to Fed. R. Civ. P. Rule 38.

## REQUESTS FOR RELIEF

WHEREFORE, Plaintiff requests judgment against Defendants for:

### First, Second, Third, Fourth, and Fifth Claims

1.    Compensatory damages for physical and psychological injury, pain and suffering, and economic damages of $250,000;

2.    Punitive damages as a result of reckless or callous indifference to a federally protected right of $500,000, Smith v. Wade, 461 U.S. 31 (1983);

3.    Costs of this action;

4.    Reasonable Attorney's fees, 28 U.S.C.A. § 1988;

5.    Declaratory relief;

6.    Such other or further relief as the court deems equitable, just, and proper.

### Sixth Claim

1.    General damages of $250,000.

2.    Costs of this action; and

3.    Such other or further relief as the court deems just and proper.

## Seventh Claim

1.    A declaration that Defendants' policy of seizing entire workplaces without probable cause or reasonable suspicion that the individuals seized therein are involved in activity illegal under immigration statutes contravenes the clear mandates of the Fourth Amendment.

2.    An order, on final hearing, that Defendants and their employees, servants, and agents, be perpetually enjoined and restrained from seizing entire businesses or manufacturing plants without reasonable suspicion that *each individual seized* therein is, in fact, engaged in illegal activity.

3.    An order, on final hearing, that Defendants and their employees, servants and agents, be perpetually enjoined from seizing or arresting plaintiff or those similarly situated based purely on their alienage or nationality.

4.    An award of costs and expenses incurred in this action.

5.    An award of all compensation as provided by law.

6.    All such other additional relief as the court deems proper.

DATED this 23day of November, 2004.


FILLMORE SPENCER, LLC

Trent M. Sutton
Attorneys for Plaintiff

26

## CERTIFICATE OF SERVICE

I certify that on the _23rd_ of November, 2004, I caused a true and correct copy of **SECOND**

**AMENDED COMPLAINT** to be served via U.S. Mail to the following:

David C. Dixon
Assistant Provo City Attorney
City of Provo
351 West Center Street
P.O. Box 1849
Provo, UT 84603

Dennis C. Ferguson
Williams and Hunt
257 East 200 South, Suite 500
P.O. Box 45678
Salt Lake City, UT 84145-5678