DENNIS C. FERGUSON (A1061)
**WILLIAMS & HUNT**
Attorneys for Defendants Provo City; Craig Geslison;
    Mark Troxel; and Daniel Cornell
257 East 200 South, Suite 500
P. O. Box 45678
Salt Lake City, Utah  84145-5678
Telephone: (801) 521-5678
Fax: (801) 364-4500

FILED
U.S. DISTRICT COURT

2006 APR -5  P 1: 44

DISTRICT OF UTAH

BY:
   DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| JOHNNY VEGA, an individual,        : | **MEMORANDUM IN SUPPORT OF** |
|                 : | **MOTION FOR SUMMARY** |
|      Plaintiff,          : | **JUDGMENT** |
|                 : | |
| v.                  : | |
|                 : | |
| UNITED STATES OF AMERICA, UNITED  : | |
| STATES BUREAU OF IMMIGRATION AND  : | |
| CUSTOMS ENFORCEMENT; UTAH    : | |
| COUNTY; PROVO CITY; STEVEN     : | |
| BRANCH, ICE officer, individually; TIMOTHY  : | |
| CHARD, ICE officer, individually; JEFFREY  : | Case No. 2:04CV00663 |
| PERKINS, ICE officer, individually; DAVID  : | |
| WARD, ICE officer, individually; UTAH   : | Judge Bruce S. Jenkins |
| COUNTY JAMES TRACY, individually;   : | |
| PROVO CITY POLICE CHIEF CRAIG    : | |
| GESLISON, individually; MARK TROXEL,  : | |
| Provo City Police Officer, individually; DANIEL  : | |
| CORNELL, Provo City Police Officer,    : | |
| individually; GRANT FERRE, officer at Utah  : | |
| County Sheriff's Department, individually;   : | |
| TODD ORTON, officer at Utah County Sheriff's  : | |
| Department, individually; JASON PHILLIPPI,  : | |
| officer at Utah County Sheriff's Department,  : | |
| individually; JOHN DOES I-XC as agents,   : | |
| servants or employees of ICE, Utah County  : | |
| Sheriff Department, and Provo City Police   : | |
| Department,              : | |
|                 : | |
|      Defendants. | |

Defendants Provo City, Craig Geslison, Mark Troxel and Daniel Cornell submit this memorandum in support of their motion for summary judgment.

## INTRODUCTION

This matter arises from the execution of a search warrant and a worksite operation by officers of Bureau of Immigration and Customs Enforcement ("ICE") which resulted in the arrest of over 100 illegal aliens.[1] Provo City, Utah County, Orem City, and other law enforcement agencies provided officers to assist in the execution of the warrant. Mr. Vega, a legal citizen of Puerto Rican origin, objects to the way he was treated during the sweep and to the length of his detention.

Plaintiff's claims against Utah County defendants were previously dismissed on summary judgment. With the sole exception of the handcuffing of Mr. Vega during the early stages of the operation, claims identical to the dismissed claims against Utah County are asserted against the Provo City defendants (hereafter "Provo City"). Provo City now seeks summary judgment on the same grounds.

The core claims against the Provo City, alleged Fourth Amendment violations during execution of the search warrant, fail as a matter of law under the recent Supreme Court decision in Muehler v. Mena, ___ U.S. ___, 125 S.Ct. 1465, 161 L.Ed.2d 299 (2005). Under Muehler, the use of handcuffs, the length of detention and the interrogation as to Mr. Vega's citizenship status are not violations of the Fourth Amendment. Because Mr. Vega is unable to establish a constitutional violation as a matter of law, his claims under 42 U.S.C. § 1983 fail.

---

[1] ICE performs the functions of the former INS and some of the exhibits attached refer to the ICE agents as INS agents.

## STATEMENT OF FACTS

1.      Defendant Craig Geslison is Chief of the Provo City Police Department. (Second Amended Complaint (the "Complaint") ¶ 8.a.)

2.      Defendants Mark Troxel and Daniel Cornell are Provo City police officers (Complaint ¶ 8.b. and c.)

3.      Prior to February of 2003, plaintiff ICE agents became aware of illegal aliens working at Champion Safe in Provo ("Champion"), Utah and served Champion with an administrative subpoena for immigration records. (Deposition of David P. Ward, pp. 19-24, copy attached as Exhibit 1.)

4.      Several discrepancies turned up in Champion's immigration records, causing ICE agents to initiate a formal investigation of the facility. (Ward Dep. 28:17 to 29:5.)

5.      Based upon evidence of fraud and harboring of aliens, ICE agents prepared a Worksite Enforcement Operation Plan ("Operation Plan"). (Ward Dep. pp. 37-45.) The plan was submitted to senior ICE officials for approval. (*Id.* 55:22 to 56:4; 57:19-58:7; Deposition of Steven Branch 23:21 to 27:5, copy attached as Exhibit 2.)

6.      Copies of the Operation Plan were not provided to other agencies or officers involved in the operation. (Ward Dep. 88:15-25.)

7.      Provo City was contacted in January of 2003 for assistance in the operation. (Deposition of Lt. Scott Finch 20:23-25, copy attached as Exhibit 3; Deposition of Mark Troxel 10:8-25, copy attached as Exhibit 4.)

8.      Lieutenant Scott Finch, on being notified of the ICE request, informed his captain and Chief Geslison. (Finch Dep. 12:19 to 15:5.) Chief Geslison's sole involvement

was a request to be kept informed on the operation and the department's proposed involvement. (*Id.* 15:3-5, 24:18-21, 25:10-22.)

9.      Provo City was aware of illegal immigrants working at Champion based upon a felony arrest by its officers of an individual who was subsequently deported. (Finch Dep. 19:9 to 20:22.)

10.      Provo City knew ICE agents were obtaining a warrant to search for illegal immigrants and employment records. (Finch Dep. 23:21 to 24:2.)

11.      In February of 2003, Mr. Vega was an employee of Champion, a manufacturing company which employed approximately 160 individuals. (Complaint ¶18.)

12.      On February 14, 2003, ICE Special Agent Tim Chard submitted an Application and Affidavit for Search Warrant (attached as Exhibit 5) to search the premises of Champion for "evidence of the hiring and continuing to employ aliens not authorized to work in the United States." In addition to physical evidence, Agent Chard presented probable cause for finding illegal aliens on the premises and requested a warrant to search for those aliens.

> I also have probable cause to believe that a search of the Champion Safe Premises will produce persons who are working or residing unlawfully in the United States and employment records which evidence such, including but not limited to, payroll records, time cards, personnel files, company ledgers, and Employment Eligibility Verification Form (Forms I-9).

> WHEREFORE, your affiant respectfully requests that a warrant issue authorizing the INS to enter and search the premises known as Champion Safe located at 2055 Larsen Parkway, Provo, Utah . . . for aliens present in the United States without legal authority and any and all records listed in Attachment B.

(Exhibit 5, p. 7, emphasis added.)

13.     On finding probable cause, Magistrate Judge Samuel Alba issued the Warrant on February 14, 2003. (Copy of Warrant attached as Exhibit 6.)

14.     On February 19, 2003, Provo City police officers Mark Troxel and Daniel Cornell assisted ICE officers in the execution of the search warrant on the premises of Champion. (Complaint ¶¶ 20-21.)

15.     Officers Troxel's and Cornell's assignment was to gather people to the front office to watch them and to keep the peace. (Troxel Dep. 29:20 to 30:9, 32:1-2.) Any other activity, such as inquiry about citizenship, was to be referred to ICE agents. (*Id.* 32:5-11.) Officer Troxel did not participate in activities outside the office. (*Id.* 20-23.) He remained in the office area until the operation was completed. (*Id.* 45:13-21.)

16.     Agent Chard was assisted by officers Troxel and Cornell in securing the office area which included the restrooms. (Deposition of Daniel Cornell 56:16-25, copy attached as Exhibit 7; Troxel Dep. 26:1-5.)

17.     Officer Cornell and an INS agent and Officer Troxel checked the men's restroom, found it occupied and announced "police search warrant." (Cornell Dep. 87:2-18, 88:15-16, 89:2-25.)

18.     One of the occupants in the restroom was Mr. Vega. (Complaint ¶ 25.)

19.     Mr. Vega protested and was slow to comply with officers' orders. (Complaint ¶¶ 27-39.)

20.     Mr. Vega continued his loud objections, verbal obscenities and noncompliance after leaving the restroom. (Troxel Dep. 38:16 to 49:19; Cornell Dep. 89:14-18, 90:13-15.)

21.     Officer Troxel determined that it was necessary to handcuff the belligerent Mr. Vega in order to maintain control of the situation and provide for the safety of the many individuals in the office area.  (Troxel Dep. 43:4-7.)

22.     After being handcuffed and seated, Mr. Vega became less belligerent.  (Troxel Dep. 43:4-7.)

23.     Officer Troxel forced Mr. Vega into a chair while his citizenship status was being verified.  (Complaint ¶ 41; Troxel Dep. 40:15-19.)

24.     As soon as Mr. Vega's citizenship status was confirmed, he was released from the handcuffs.  (Complaint ¶ 42.)

25.     Mr. Vega was detained inside the office for less than five minutes.  (Troxel Dep. 44:1-9.)

26.     Mr. Vega was escorted outside.  (Troxel Dep. 44:3-7.)

27.     U.S. Citizens were free to do as they pleased except for reentering the building until after the operation had been completed.  (Ward Dep. 93:1-19, 129:16-18; Branch Dep. 21:25 to 22:2; Troxel Dep. 34:17 to 35:17.)  Some went to their cars and a few drove from the premises.  (Finch Dep. 65:22 to 66:18.)

28.     Officers Troxel and Cornell had no further contacts with Mr. Vega.  (Troxel Dep. 44:3-7.)

29.     After escorting individuals outside, Officer Cornell completed his assignment inside the building.  (Cornell Dep. 102:11-13, 102:19-23.)

## ARGUMENT

**I. VEGA'S CLAIMS AGAINST THE JOHN DOE DEFENDANTS SHOULD BE DISMISSED FOR FAILURE TO IDENTIFY AND SERVE THOSE DEFENDANTS.**

Vega has named only Chief Geslison, Officer Troxel and Officer Cornell individually, but has also named several John Doe police department defendants. He has, however, not served any of the John Doe defendants within the requisite 120-day period as required by Rule 4(m), Fed.R.Civ.P. All of the Provo City police officers involved in the Champion Safe warrant search were identified in the City's Rule 26 disclosures. Vega has knowledge of the true identities of the John Doe defendants but has not chosen to serve them. Federal law does not permit unlimited time for doing so.

> Although well over 120 days have passed since Aviles filed his complaint, he has yet to identify and serve the "John Doe" defendants. Aviles appears to believe that he has an unlimited amount of time to complete this task; he asserts that when he identifies the officers, he will amend his complaint to name them, and have 120 days from the filing of the amended complaint to serve these "new" defendants. This contention, however, has been implicitly rejected by the Seventh Circuit, *see Williams v. Leach*, 938 F.2d 769, 770 n. 1 (7th Cir.1991), as well as by district courts across the country. *See, e.g., Mathon v. Marine Midland Bank, N.A.*, 875 F.Supp. 986, 998 (E.D.N.Y.1995); *Mercado v. Betancourt Y Lebron*, Civ. No. 91-2323, 1993 WL 54419, at *6 (D.P.R. Jan. 4, 1993); *Brown v. Wilson*, No. 89 C 2387, 1991 WL 274922, at *4 (N.D.Ill. Dec. 17, 1991) (construing Williams as requiring that John Doe defendants be identified and served within 120 days of filing); *Longo v. Allied Van Lines, Inc.*, 610 F.Supp. 270, 271 (E.D.N.Y.1985). These authorities clearly support the proposition that John Doe defendants must be identified and served within 120 days of the commencement of the action against them.

Aviles v. Village of Bedford Park, 160 F.R.D. 565, 567 (N.D.Ill. 1995).

Because Vega has not served any of the John Doe defendants, any claims against them are properly subject to summary judgment.[2]

## II. NEITHER OFFICER TROXEL NOR OFFICER CORNELL VIOLATED MR. VEGA'S FOURTH AMENDMENT RIGHTS.

The essence of Mr. Vega's claim against Officer Troxel and Officer Cornell is that one of them pulled Mr. Vega from a restroom stall, refused to permit him to finish his bathroom business or to wash his hands, handcuffed him and took him to the office until ICE officials could verify his citizenship. The claims addressed to conduct of Officers Troxel and Cornell allege that they forcibly "detained and arrested" Mr. Vega "without a warrant, without probable cause, and in an unreasonable manner" and that they violated his rights "when they physically seized and searched Plaintiff in the bathroom, when they detained and searched Plaintiff in the front office, when they detained and searched Plaintiff outside the building. However unreasonable these actions may seem to Mr. Vega, they do not rise to the level of Fourth Amendment violations.

It is important to recognize at the outset that the search of the Champion premises was conducted pursuant to a facially valid search warrant. Mr. Vega has not challenged the validity of the warrant.[3] It is also clear that ICE agents intended to search the premises for

---

[2] All of the Provo City John Doe defendants were engaged in securing and patrolling the outside of the premises, activities which this Court has already found insufficient to support a claim of constitutional violation against the Utah County Sheriff's deputies.

[3] If the validity of the warrant were questioned, these defendants would be presumptively entitled to qualified immunity on the basis that the warrant had been issued by a magistrate. *E.g.*, Simms v. Village of Albion, 115 F.3d 1098, 1106 (2nd Cir. 1997) (citing U.S. v. Leon, 468 U.S. 897, 922, 104 S.Ct. 3405, 3420, 82 L.Ed.2d 677 (1984)) ("A police officer who relies in good faith on a warrant issued by a neutral and detached magistrate upon a finding of probable cause is presumptively shielded by qualified immunity from personal liability for damages. Police activity conducted pursuant to a

illegal aliens in addition to their search for documentary evidence of the illegal activities of Champion. The Operation Plan (attached as Exhibit 8) clearly contemplates detention of people as well as seizure of documents. Provo City was merely assisting in execution of the ICE warrant and was operating under its direction.

Mr. Vega's Fourth Amendment claims are evaluated under the standard of objective reasonableness. Graham v. Connor, 490 U.S. 386, 396-97 (1989) (dealing with excessive force claims). "[T]he question is whether the officers' actions are 'objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent and motivation." Id. at 396 (citations omitted). The controlling law in this matter is Michigan v. Summers, 452 U.S. 692 (1981). In Summers, the Supreme Court addressed the issue of whether a prolonged detention during execution of a facially valid search warrant violated the Fourth Amendment. There, the occupant of the premises was not free to leave during the search. Summers at 696.

The Summers court treated the detention as the equivalent of a *Terry* stop under Terry v. Ohio, 392 U.S. 1 (1968). Id. at 698, 700. It noted that the existence of the warrant in the Summers case was "of prime importance in assessing the intrusion." Id. at 701. The court also noted the legitimate law enforcement interest in preventing flight and protecting the officers as a factor in weighing the degree of intrusion. "The risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation." Id. at 702. The Summers court held that detention of individuals during a search was constitutionally permissible.

---

warrant rarely will require any deep inquiry into reasonableness because a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith.")

> [F]or Fourth Amendment purposes, we hold that a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted.

Summers at 705 (footnotes omitted). The court instructed that its holding was not applicable on a case by base basis.

> The rule we adopt today does not depend upon such an ad hoc determination, because the officer is not required to evaluate either the quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure.

Summers at 705 n. 19 (emphasis added).

The fact that detention was at a place of business rather than a residence, as in Summers, is immaterial. Several courts have upheld the Summers standards in warranted searches of business premises for documentary evidence as well as contraband. Ganwich v. Knapp, 319 F.3d 1115, 1120 (9th Cir. 2003) (reasonable to detain employees on business premises during search of building); U. S. v. Photogrammetric Data Services, Inc. 259 F.3d 229, 239 (4th Cir. 2001) (agents "necessarily had authority to secure the premises and detain the employees temporarily in order to conduct the search with minimal interference."); Leveto v. Lapina, 258 F.3d 156, 166 (3rd Cir. 2001) (recognizing that Summers applies to business premises, but holding that 8-hour detention violated Fourth Amendment).

The Supreme Court recently relied upon the Summers standards in rejecting a § 1983 action with claims similar to those alleged by Mr. Vega. Muehler v. Mena, ___ U.S. ___, 125 S.Ct. 1465 (2005). In Muehler, the plaintiff, a legal permanent resident, had been detained during a search, handcuffed for the two-three hour duration of the search, and questioned about her immigration status without any independent suspicion of illegal

alienage. The district court entered judgment for the plaintiff and the Ninth Circuit affirmed. The Supreme Court vacated the judgment, finding no Fourth Amendment violation.

> The Court of appeals affirmed the judgment, holding that the use of handcuffs to detain Mena during the search violated the Fourth Amendment and that the officers' questioning of Mena about her immigration status during the detention constituted an independent Fourth Amendment Violation. We hold that Mena's detention in handcuffs for the length of the search was consistent with our opinion in *Michigan v. Summers*, and that the officers' questioning during that detention did not violate her Fourth Amendment rights.

Muehler 125 S.Ct. at 1468 (citations omitted).

Relying on Summers and Graham v. Connor, *supra*, the court found no violation in detaining Mena in handcuffs for the full duration of the search despite the fact that she had not been named as a suspect in the search warrant. Muehler 125 S.Ct. at 1470-71.

> Mena's detention was, under *Summers*, plainly permissible. An officer's authority to detain incident to a search is categorical; it does not depend on the quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure. Thus, Mena's detention for the duration of the search was reasonable under *Summers* because a warrant existed to search 1363 Patricia Avenue and she was an occupant of that address at the time of the search.

> Inherent in *Summers'* authorization to detain an occupant of the place to be searched is the authority to use reasonable force to effectuate the detention.

> The officers' use of force in the form of handcuffs to effectuate Mena's detention in the garage, as well as the detention of the three other occupants, was reasonable because the governmental interests outweigh the marginal intrusion.

Muehler 125 S.Ct. at 1470 (punctuation, citations omitted).

The court also tied the reasonableness of the length of time a detained occupant is handcuffed to the "continuing safety interests" under the circumstances of the particular

search, holding that Mena's 2- to 3-hour detention in handcuffs was reasonable under the circumstances involved. *Id.* 125 S.Ct. at 1471.

With respect to the issue of questioning Mena's immigration status, the court noted that where the initial detention was lawful, that "no additional Fourth Amendment justification for inquiring about Mena's immigration status was required." *Id.* 125 S.Ct. at 1472.

Particularly applicable to Mr. Vega's detention are the remarks in the concurring opinion of Justice Kennedy.

> The safety of the officers and the efficacy of the search are matters of first concern, but so too is it a matter of first concern that excessive force is not used on the persons detained, especially when these persons, though lawfully detained under *Michigan v. Summers*, are not themselves suspected of any involvement in criminal activity. The use of handcuffs is the use of force, and such force must be objectively reasonable under the circumstances.

> The reasonableness calculation under *Graham* is in part a function of the expected and actual duration of the search. If the search extends to the point when the handcuffs can cause real pain or serious discomfort, provision must be made to alter the conditions of detention at least long enough to attend to the needs of the detainee. This is so even if there is no question that the initial handcuffing was objectively reasonable. The restraint should also be removed if, at any point during the search, it would be readily apparent to any objectively reasonable officer that removing the handcuffs would not compromise the officers' safety or risk interference or substantial delay in the execution of the search. The time spent in the search here, some two to three hours, certainly approaches, and may well exceed, the time beyond which a detainee's Fourth Amendment interests require revisiting the necessity of handcuffing in order to ensure the restraint, even if permissible as an initial matter, has not become excessive.

> That said, under these circumstances I do not think handcuffing the detainees for the duration of the search was objectively unreasonable. As I understand the record, during much of this search 2 armed officers were available to watch over the 4 unarmed detainees, while the other 16 officers on the scene conducted an extensive search of a suspected gang safe house. Even if we accept as true--as we must--the

> factual assertions that these detainees posed no readily apparent danger and that keeping them handcuffed deviated from standard police procedure, it does not follow that the handcuffs were unreasonable. Where the detainees outnumber those supervising them, and this situation could not be remedied without diverting officers from an extensive, complex, and time-consuming search, the continued use of handcuffs after the initial sweep may be justified, subject to adjustments or temporary release under supervision to avoid pain or excessive physical discomfort. Because on this record it does not appear the restraints were excessive, I join the opinion of the Court.

Muehler 125 S.Ct. at 1472-73 (Kennedy, J., concurring; citations omitted).

In seeking the warrant, Agent Chard had information that as many as half of the 160 employees at Champion Safe were illegal aliens.[4] As a result, the risk of flight as well as violent reactions was real. Under the circumstances, it was appropriate to detain all employees until their citizenship could be determined. The length of the detention was reasonably based upon the need to contain and identify the 160 employees of Champion Safe.[5] That some non-aliens, including Mr. Vega, were also detained does not make the detention any less reasonable. The Muehler holding makes that clear.

Mr. Vega's removal from the restroom stall was objectively reasonable. Agent Chard, Officer Troxel and Officer Cornell were gathering a large group of individuals in the office area. No officer had any objective means of determining that Mr. Vega was, in fact, a legal citizen without ICE first checking his citizenship status. Having two of the three officers in the restroom increased the proportion of detainees to officers elsewhere in the office area, the circumstance which presented concern to Justice Kennedy in Muehler. It

---

[4] It turned out, to the surprise of ICE agents, that 102 undocumented workers were arrested at Champion's premises. (Ward Dep. 108:18-20.)

[5] Ultimately 107 people were arrested. See Salt Lake Tribune, November 8, 2004 and November 11, 2004.

was necessary to act quickly to get the two men from the restroom into the office area as efficiently and quickly as possible.

Mr. Vega did not help the situation by being uncooperative and belligerent. The circumstances, even if benign in retrospect, carried the potential for escalation. Officer Troxel made the determination that it was necessary to handcuff Mr. Vega in order to maintain control of the situation and assure the safety of officers and other individuals. Under the circumstances, his decision was reasonable. In fact, it had the desired effect of maintaining control of the group because the handcuffing and seating caused Mr. Vega to be less belligerent.

The Fourth Amendment concerns discussed by Justice Kennedy are also not present here. The cuffs were in place only long enough to determine Mr. Vega's citizenship, after which he was freed. The duration of the handcuffed detention is simply not an issue here.

Nor, as established by Muehler, is the investigation of citizenship during detention for execution of a search warrant a Fourth Amendment violation. While Mr. Vega objects to being detained until his citizenship status could be confirmed, the circumstances of this case provide no basis for a claim of constitutional violations.

Nor, as established by Muehler, is the investigation of citizenship during detention for execution of a search warrant a Fourth Amendment violation. While Mr. Vega believes he was suspected of being an illegal alien based upon his Hispanic origins, the circumstances of this case provide no basis for a claim of constitutional violations. As with all Champion employees who were determined to be U.S. Citizens, Mr. Vega was free to leave, but not to reenter the building until the operation was complete. Despite the allegations of the Complaint, the facts do not establish that any Provo City police officer detained Mr. Vega

except briefly in the office. Officers Troxel and Cornell both performed their assignments within the building and could not have continued the alleged detention outside.

To the extent that an excessive force claim may be inferred from the Complaint, the law does not support it. The Graham court, in applying the objectively reasonable analysis to excessive force claims, specified the standard for evaluation of those claims.

> [T]he reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . With respect to a claim of excessive force . . . [n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers . . . violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments–in circumstances that are tense, uncertain, and rapidly evolving–about the amount of force that is necessary in a particular situation.

Graham 490 U.S. at 396 (punctuation, citations omitted). As noted by the court in Muehler, some degree of physical force is appropriate in detaining individuals during execution of a search warrant. The threshold for a finding of excessive force is high. The Tenth Circuit in Thompson v. City of Lawrence, 58 F.3d 1511, 1517 (10th Cir. 1995) declined to find excessive force where officers drew weapons on a bystander, handcuffed her and pushed her to the floor. The force used against Mr. Vega, even by the allegations of his Complaint, were *de minimis* and clearly fall within the scope of Graham and Thompson.

Under governing law, the actions of Officers Troxel and Cornell were objectively reasonable and did not constitute Fourth Amendment violations.

**III. EVEN IF THIS COURT WERE TO DISTINGUISH <u>MUEHLER</u> TO FIND A CONSTITUTIONAL VIOLATION, OFFICERS TROXEL AND CORNELL ARE ENTITLED TO QUALIFIED IMMUNITY.**

Qualified immunity is available to police officers where the alleged conduct does not violate "clearly established constitutional rights of which a reasonable person would have known." <u>England v. Hendricks</u>, 880 F.2d 281, 283 (10th Cir. 1989), *cert. denied*, 492 U.S. 1078 (1990). The two issues to be decided in the qualified immunity analysis are: (1) whether the actions were objectively reasonable; and (2) what the current applicable law is and whether the law was clearly established at the time of the actions. <u>England</u> at 283-84. The issue of objective reasonableness is one for legal resolution by the Court. *Id.*

A constitutional right is only clearly established where there is a "Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts [has] found the law to be as plaintiff maintains." <u>Albright v. Rodriguez</u>, 51 F.3d 1531, 1535 (10th Cir. 1995) (punctuation, citations omitted). There is no Supreme Court or Tenth Circuit case law establishing that (1) detention of occupants of a business premises, even for a relatively long period, during execution of a search warrant is a Fourth Amendment violation; (2) use of handcuffs for a very short period during detention is a Fourth Amendment violation; (3) questioning a detained person about citizenship is a Fourth Amendment violation; or (4) *de minimis* use of force in effecting a detention is excessive force. In fact the governing case law is to the contrary on all four counts.

Even if this Court were to find a constitutional violation in Mr. Vega's allegations, these officers would be entitled to qualified immunity.

## IV. PROVO CITY HAS NO § 1983 LIABILITY UNDER THE FACTS OF THIS CASE.

Mr. Vega's claims against Provo City appear to be based on the argument that it failed to establish policies or customs which would protect the constitutional rights of individuals. Mr. Vega also makes allegations of insufficient training of Provo City police officers. None of these are factually supported and, as a matter of law, fail to establish a § 1983 claim.

### A. THERE CAN BE NO "POLICY" OR "TRAINING" LIABILITY WITHOUT AN UNDERLYING CONSTITUTIONAL VIOLATION.

The actions of Officers Troxell and Cornell do not rise to constitutional violations. As a result, there can be no municipal liability based upon allegations of insufficient policies or improper training. "A municipality will not be held liable [for constitutional violations] when there [is] no underlying constitutional violation by any of its officers." Hinton v. City of Elwood, 997 F.2d 774, 782 (10th Cir. 1993). It is also axiomatic that a public entity may not be held liable for the unconstitutional conduct of an employee on the theory of vicarious liability. Monell v. Dept. of Social Services, 436 U.S. 658, 690 (1978). "It is only when the 'execution of the government's policy or custom . . . inflicts the injury' that the municipality may be held liable under § 1983." City of Canton v. Harris, 489 U.S. 378, 385 (1989) (internal citation omitted). Before policy or training can become issues, there must be an underlying constitutional injury inflicted by the municipal employee and that injury must have arisen from a policy of or lack of training by the municipality. In the case of training, § 1983 liability attaches only "where the failure to train amounts to a deliberate indifference to the rights or persons with whom the police come in contact." Id.

In this case, the City's assistance with execution of the search warrant involved only a policy to support other law enforcement agencies in the execution of search warrants when reasonably requested. It is difficult to understand how such a policy can be viewed as unreasonable, but impossible to understand how it could meet the "deliberate indifference" standard for imposition of § 1983 liability. Only "when the municipality has actual or constructive notice that its action or failure is substantially certain to result in a constitutional violation, and it consciously and deliberately chooses to disregard the risk of harm" can it be subject to liability under § 1983. Barney v. Pulsipher, 143 F.3d 1299, 1307 (10th Cir. 1999). Additionally, the official policy must operate as the "moving force" behind the violation, and the plaintiff must demonstrate a "direct causal link" between the action and the violation of rights. Bd. of County Comm'rs v. Brown, 520 U.S. 397, 399 (1997). Mr. Vega cannot make that showing here. The policy of supporting other police agencies cannot be viewed as "deliberately indifferent" or to have a "direct causal link" between the policy and the alleged violation.

## B. MR. VEGA'S CLAIMS OF INADEQUATE TRAINING ARE UNSUPPORTED FACTUALLY AND LEGALLY.

"A . . . municipality may be held liable where there is essentially a complete failure to train, or training that is so reckless or grossly negligent that future misconduct was almost inevitable." Meade v. Grubbs, 841 F.2d 1512, 1528 (10th Cir. 1988) (emphasis added, citations omitted). Neither element is present here.

Circuit courts which have addressed the issue of failure to train have declined to find municipal liability in those cases where the officers in question had successfully completed the minimum training mandated by state law and been certified by the state. Benavides v. County of Wilson, 955 F.2d 968, 973 (5th Cir. 1992), cert. denied 506 U.S. 824, 113 S.Ct.

79, 121 L.Ed.2d 43 (1992). The issue of minimum, state-prescribed training is case dispositive. In Tapia v. City of Greenwood, 965 F.2d 336 (7th Cir. 1992), a case involving a warrantless search by SWAT team members, the city demonstrated that it was in compliance with the minimum standards for training police officers under Indiana law and that the officers involved had received the training. The Seventh Circuit held that where the state imposed minimum training standards on municipalities, evidence showing adherence to those standards barred any finding that the policymakers were deliberately indifferent to the need for better training. Tapia at 339-40. The First Circuit has similarly found no failure to train liability where the city's training policies were "in accord with the requirements of state law." Manarite v. City of Springfield, 957 F.2d 953, 959 (1st Cir. 1992) cert denied, 506 U.S. 837, 113 S.Ct. 113, 121 L.Ed.2d 70 (1992).[6]

Utah statute requires that a law enforcement officer, prior to being employed, satisfactorily complete the basic course at a certified law enforcement training academy. Utah Code Ann. §§ 53-13-103(4)(a), 53-6-205(1)(a). Basic training provided by POST (Police Officer Standards and Training) includes training in arrest, search and seizure, use of

---

[6] *See also* La v. Hayducka, 269 F.Supp.2d 566, 583 (D.N.J. 2003) (no failure to train liability where officer received state training despite allegations that training was inferior to that given in adjacent state); Glidewell v. Town of Gantt, 176 F.Supp.2d 1257, 1262 (M.D.Ala. 2001) (no failure to train absent evidence that town was aware that training provided by state body was deficient); Rochleau v. Town of Millbury, 115 F.Supp.2d 173, 179 (D.Mass. 2000) (no failure to train where, inter alia, officer was trained in compliance with state statute); Horn v. City of Seat Plasant, 57 F.Supp.2d 219, 227 (D.Md. 1999) (where officer received training from state training academy, deficiency in training would be breach by state, not municipality); Barber v. Guay, 910 F.Supp. 790, 801 (D.Me. 1995) (no failure to train despite officer's "poor showing" at police academy where he completed the training and all statutory mandated training); Timko v. City of Hazleton, 665 F.Supp. 1130, 1139-40 (M.D.Pa. 1986) (city not liable for failure to train where officer received state mandated training for basic police procedures).

force and other basic police procedures. R728-404-2.K., Utah R.Admin.Code. To successfully complete POST training, a trainee must achieve a score of 80 percent on the State Certification exam. *Id.* POST student will not be certified if he misses the classes on the fundamental elements of police work. Utah Admin.Code R728-401-3.H. To continue to be employed as a law enforcement officer, an individual must complete annual training. Utah Admin.Code.R. 728-410-2

Completion of POST training and certification by the State satisfy the minimum training required by <u>City of Canton</u> and its progeny. Both Officer Troxel and Officer Cornell have completed POST training and are currently certified police officers. Mr. Vega's claims of lack of training therefore fail as a matter of law.

## V. THE CLAIMS AGAINST CHIEF CRAIG GESLISON FAIL AS A MATTER OF LAW.

Chief Geslison has been dismissed from this action in his representative capacity.[7] There are no facts which place Chief Geslison on the Champion Safe premises during the search or otherwise demonstrate his direct involvement in the alleged constitutional violations.

To impose liability on supervisors under § 1983, there must be personal involvement in the constitutional violation by the supervisor or a causal connection between the supervisor's alleged failure to supervise and the constitutional violation committed by a subordinate. <u>Redman v. County of San Diego</u>, 942 F.2d 1435, 1446 (9th Cir. 1991) (en

---

[7] Defendants believe that the Court's ruling dismissed the claims against Chief Geslison in his individual capacity as well. Plaintiff has refused to approve the order which would give effect to that ruling, arguing that he may be dismissed only in his representative capacity.

banc). The Tenth Circuit discussed vicarious § 1983 liability in <u>Meade v. Grubbs,</u> 841 F.2d

1512 (10th Cir. 1988).

> A supervisor is not liable under section 1983 unless an affirmative link exists between the constitutional deprivation and either the supervisor's personal participation, his exercise of control or direction, or his failure to supervise. To be liable, a superior must have participated or acquiesced in the constitutional deprivations of which complaint is made. A supervisor or municipality may be held liable where there is essentially a complete failure to train, or training that is so reckless or grossly negligent that future misconduct is almost inevitable. Unless a supervisor has established or utilized an unconstitutional policy or custom, a plaintiff must show that the supervisory defendant breached a duty imposed by state or local law which caused the constitutional violation.

<u>Meade</u> at 1527-28 (punctuation, citations omitted).

To prevail on a § 1983 claim against Chief Geslison as an individual, Mr. Vega must

establish that the Chief participated personally in the alleged violation. <u>Mitchell v.</u>

<u>Maynard,</u> 80 F.3d 1433, 1441 (10th Cir. 1996) ("Personal participation is an essential

allegation that must be proven before a plaintiff can recover on a § 1983 claim.") Mr. Vega

must establish that Chief Geslison deliberately and intentionally acted to violate his

constitutional rights. <u>Jenkins v. Wood,</u> 81 F.3d 988, 994-95 (10th Cir. 1996).

There is no evidence that Chief Geslison was personally involved in any manner in

the execution of the search warrant in a manner that could be causally connected to any

constitutional violation. He was not present on the Champion Safe premises. He did not

control or supervise the activities of those who were present. The only policy which he

exercised was that of cooperating with other law enforcement agencies, specifically

providing security for the execution of the search warrant. As a matter of law, this cannot

be characterized as an "unconstitutional policy or custom."

There is also lack of causation. There is no factual basis or reasonable inference upon which to conclude that had Chief Geslison refused to assist ICE in the execution of the warrant, the alleged Fourth Amendment violations would not have occurred.

Even if there were sufficient factual basis to find a causal connection, however, Chief Geslison is entitled to qualified immunity. His only involvement was to support a policy of providing officers to assist ICE agents in the execution of the search warrant. The key to the qualified immunity issue is the "objective reasonableness" of the official conduct. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The ultimate question is "whether a reasonable officer could have believed lawful the particular conduct at issue." Romero v. Kitsap County, 931 F.2d 624, 627 (9th Cir. 1991) (citation omitted). In a qualified immunity analysis, the objective reasonableness of an officer's actions is a legal question for the court. Roska v. Peterson, 328 F.3d 1230, 1251 (10th Cir. 2003).

There is no case law, Tenth Circuit, Supreme Court or otherwise, which holds that allowing city police officers to assist federal officers in the execution of a facially valid search warrant constitutes a constitutional violation. Chief Geslison could not have reasonably anticipated that doing so would be the basis of a claim against him. Therefore, even if the requisite elements for supervisory liability were present, he would be entitled to qualified immunity.

## CONCLUSION

Under governing law, the detention, temporary handcuffing and interrogation as to citizenship of a U. S. citizen during execution of a warrant to search for evidence and presence of illegal aliens is not a constitutional violation. Mr. Vega is unable, as a matter of

law, to establish his § 1983 claims, entitling the Provo City defendants to summary judgment.

DATED this __5__ day of April, 2006.

WILLIAMS & HUNT

By _____
Dennis C. Ferguson
Attorneys for Attorneys for
Defendants Provo City; Craig
Geslison; Mark Troxel and Daniel
Cornell

124939.1

# AFFIDAVIT OF SERVICE

STATE OF UTAH          )
                          : ss.

COUNTY OF SALT LAKE    )

       Penny L. Edwards, being duly sworn, says that she is employed in the law offices of Williams & Hunt, attorneys for Defendants Provo City; Craig Geslison; Mark Troxel; and Daniel Cornell herein, that she served the attached **MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** in Case No. 2:04-CV-00663 before the United States District Court, upon the parties listed below by placing a true and correct copy thereof in an envelope addressed to:

<table>
<tr>
<td>

**Counsel for Plaintiff**
Mark D. Stubbs
Trent M. Sutton
FILLMORE SPENCER, LLC
3301 N. University Avenue
Provo, UT 84604


David C. Dixon
Assistant Provo City Attorney
**City of Provo**
351 West Center Street
P.O. Box 1849
Provo, Utah 84603

</td>
<td>

**Counsel for U.S. Department of Justice**
Glenn S. Greene
Torts Branch, Civil Division
P. O. Box 7146
Ben Franklin Station
Washington, DC 20044


Carlie Christensen
Office of the United States Attorney
185 S. State Street #400
Salt Lake City, Utah 84111-1506

</td>
</tr>
</table>

and causing the same to be mailed first class, postage prepaid, on the __5__ day of April, 2006.

_____
Penny L. Edwards

SUBSCRIBED AND SWORN TO before me this __5th__ day of April, 2006.

_____
Notary Public

NOTARY PUBLIC
DANETTE A. LYON
257 East 200 South Ste 500
Salt Lake City, UT 84111
COMMISSION EXPIRES
September 11, 2006
STATE OF UTAH